439 F.2d 57
 Marie Carol GAGNIER, as Trustee for the Heirs of Oliver L. Gagnier, Deceased, Plaintiff-Appellee,
v.
Chris BENDIXEN and the Chicago, Rock Island and Pacific Railroad Company, Defendants-Appellants.
 No. 20474.
 United States Court of Appeals, Eighth Circuit.
 March 17, 1971.
 
 Charles A. Flinn, Jr., Stringer, Donnelly, Allen & Sharood, St. Paul, Minn., for defendant-appellants.
 Mark M. Nolan, St. Paul, Minn., Douglass, Bell, Donlin, Shultz & Petersen, by James R. Bell, St. Paul, Minn., for plaintiff-appellee.
 Before VAN OOSTERHOUT, GIBSON and LAY, Circuit Judges.
 GIBSON, Circuit Judge.
 
 
 1
 This is a diversity action arising out of a truck-train collision near Clarks Grove, Minnesota, which resulted in the death of the truck driver. The decedent's wife, as trustee of the deceased's heirs, brought a wrongful death action in the District Court of Minnesota against the railroad for negligence. The issues in the case are governed by the Minnesota Comparative Negligence Act, M.S.A. § 604.01 (1969),[1] and the jury rendered a verdict finding the railroad 60 percent negligent and the deceased 40 percent negligent. Judgment was entered in accordance with the verdict,[2] and the railroad appeals.
 
 
 2
 The accident occurred at 9:45 p.m. on December 11, 1968, a dark, cloudy, windy, misty night. At the crossing where the accident occurred, the train tracks run east and west, U.S. Highway No. 65 runs north and south. The train was to the east of the highway, proceeding west, and the engineer was seated on the south side of the engine cab, with a view to the south. The truck was to the south of the tracks, proceeding north. The highway has a crest approximately one-quarter to one-half mile south of the crossing. Once that crest is surmounted, the grade is downgrade all the way to the crossing, and the view of the tracks is relatively unobstructed.
 
 
 3
 The train proceeded westward toward the crossing at a speed of approximately 10-15 miles per hour. Its headlight was on, and its whistle and bell were both sounding. When the train was about 80-100 feet from the crossing, the engineer saw the lights of the truck come over the crest of the hill to the south. He did not slow down and continued toward the crossing. When the truck was approximately 100 feet from the crossing, it suddenly swerved into the left-hand lane of the highway or jackknifed. At this point the engineer realized the truck was not going to stop and immediately applied his emergency brake. The train was unable to stop in time and was struck by the cab of the truck just in front of the engine cab door. The train came to a full stop approximately 50 feet past the crossing. The deceased driver was thrown from his truck cab and died instantly.
 
 
 4
 Just prior to the accident, the truck was traveling at a speed of about 40 miles an hour in a 50-mile per hour speed zone. The driver was an experienced trucker who had traveled this road many times and knew that the railroad crossing was there. The train had the right of way across the crossing.
 
 
 5
 Certain facts material to this decision are in dispute. Plaintiff introduced a letter written on July 3, 1938, from the Minnesota Railroad and Warehouse Commission to the defendant railroad company regarding this crossing, where a serious accident had occurred. The letter read:
 
 
 6
 "The Commission, having investigated the above mentioned accident, are of the opinion that due to the uncertainty of train schedules over this line and heavy highway traffic, trains approaching this crossing should come to a full stop before proceeding over same.
 
 
 7
 "Will you please have this matter investigated and advise the Commission in the premises."
 
 
 8
 The railroad advised the Commission that it would arrange to have its trains stop. There is testimony in the record to the effect that the trains ordinarily do stop at this crossing, prior to proceeding across it. There is a "stop board" on the tracks approximately 125 feet east of the crossing. The evidence is in conflict as to whether the train actually stopped there on the night of the accident.
 
 
 9
 The crew members on defendant's train testified that the train did in fact stop, the brakeman got off the train, walked to the crossing, placed a flare, looked for traffic and not seeing any, signaled the engineer to proceed, returned to the train and got on. The train then proceeded across the highway, when the above recited events occurred. The only evidence contradicting this account was the testimony of Robert Hanson, a farmer whose house was located approximately 200 feet north of the crossing. Hanson testified that he had lived at that location for eight years and could tell by the sound of the train whether it was moving or stopped. He was in bed at the time the accident occurred and did not see any of the events, but testified that in his opinion, judging from the sound of the train, it did not stop during its approach to the crossing prior to the accident.
 
 
 10
 As discussed more fully below, the evidence is clear that the deceased was guilty of contributory negligence as a matter of law. However, under a comparative negligence statute this is not sufficient to bar the plaintiff's recovery. Nevertheless, the evidence must be sufficient to support a finding that the defendant's causal negligence was greater than that of the plaintiff in order to sustain a judgment of liability. There is some question as to whether the evidence in this case is sufficient to support a finding of negligence on the part of the railroad at all, but in any event, we think it is clear that the evidence is not sufficient to show that the railroad was more negligent than the deceased.
 
 
 11
 The Minnesota comparative negligence statute, having been enacted in 1969, has not yet been interpreted by the Minnesota Supreme Court in a factual situation analogous to the instant case. However, the statute is taken directly from a similar Wisconsin statute, and the Minnesota Supreme Court has acknowledged that decisions of the Wisconsin Supreme Court in interpreting its comparative negligence statute afforded precedential value in interpreting the Minnesota statute. Olson v. Hartwig, 288 Minn. 375, 180 N.W.2d 870 (1970). Thus we will look to certain relevant Wisconsin decisions on the interpretation and application of the comparative negligence statute and to the Minnesota decisions as to the substantive negligence law to be applied in this case.
 
 
 12
 The law of Wisconsin is clear that while, ordinarily, comparison of negligence is for the jury, where the evidence reveals that the negligence of the plaintiff is at least as great as that of the defendant, the trial court must direct a verdict for the defendant. Brunner v. Minneapolis, St. P. & S. Ste. M. R. Co., 139 F.Supp. 424 (E.D.Wis.1956), aff'd, 240 F.2d 608 (7th Cir. 1957), and cases therein cited; Ligman v. Bitker, 270 Wis. 556, 72 N.W.2d 340 (1955); Peters v. Chicago, M., St. P. & P. Ry. Co., 230 Wis. 299, 283 N.W. 803 (1939). The facts of Ligman v. Bitker are sufficiently analogous to the instant case to illustrate the application of the principle. The accident in that case occurred on the afternoon of a clear day at a railroad crossing in open country. There was evidence to the effect that the driver's view of the approach to the crossing was somewhat obscured by trees and shrubbery. The train approached the crossing at a speed of 45 miles per hour, and the evidence was sufficient to support a finding that the train crew was negligent in failing to give proper warning signals as it approached. On the other hand, the driver of the automobile failed to have his car under proper control so that he was able to stop prior to the collision. The court held that under these circumstances the negligence of the deceased was at least as great as that of the defendant railroad, and the fact that the trees might have obscured his view simply increased his duty of care.
 
 
 13
 "If he saw the train approaching the intersection and, under the circumstances, attempted to cross the track, he was grossly negligent in precipitating himself into a situation of grave danger. If he attempted to cross without looking before he reached the tracks, he was guilty of failure to exercise care in any degree. * * * Plaintiff's failure to exercise any degree of care for his own safety must, of course, be held to be the equivalent at least of the negligence of the motorman." 72 N.W.2d at 343.
 
 
 14
 The judgment of the trial court finding the defendant 60 per cent causally negligent was reversed and remanded with directions to dismiss the complaint.
 
 
 15
 In determining whether the evidence in this case is sufficient to support the jury's verdict that defendant was more negligent than the plaintiff's decedent, we must apply the law of Minnesota with respect to the rights and duties of railroads at highway crossings.
 
 
 16
 We start with the proposition that the train has the right of way at all crossings, and furthermore, that the train crew may properly assume that a driver of a vehicle approaching a crossing will exercise care and stop if a train is approaching; the crew need not themselves stop or reduce the speed of the train until it becomes apparent to them that the automobile driver will not stop and that a collision is therefore imminent. Forde v. Northern Pac. Ry. Co., 241 Minn. 246, 63 N.W.2d 11, 18 (1954); Schroht v. Voll, 245 Minn. 114, 71 N.W. 2d 843, 847 (1955).
 
 
 17
 Of course, the railroad has the duty to use due care to avoid accidents at railroad crossings. The question is what standards of conduct comport with the requirement of due care. The rule in Minnesota is that where there are no unusually dangerous circumstances rendering a crossing "extra-hazardous," compliance with all statutory safety requirements satisfies the requirement of due care. Leisy v. Northern Pac. Ry. Co., 230 Minn. 61, 40 N.W.2d 626, 629 (1950). Thus, in order to find negligence on the part of the railroad in the instant case, we must either find that the crossing in question was "extra-hazardous," thus necessitating extra precautionary measures which were not taken by the defendant, or that the defendant did not even satisfy the statutory safety requirements.
 
 
 18
 We do not understand that the plaintiff in this case contends that the crossing in question was "extra-hazardous." In any event, it is clear that as a matter of law the crossing in question is not "extra-hazardous." The crossing is located in sparsely-populated open country, not in a population center. The tracks cross at right angles to the highway. There are no obstructions to vision for at least one-fourth mile back from the crossing, and perhaps as much as one-half mile. Haukom v. Chicago Great Western Ry. Co., 269 Minn. 542, 132 N.W.2d 271, 277 (1964) and cases therein cited. The plaintiff suggests that because the night was dark and cloudy and misty, due care might require extra warning devices than those prescribed by statute. However, such a contention was expressly rejected by the Minnesota Supreme Court in Seekins v. Duluth, M. & I. R. Ry. Co., 258 Minn. 180, 103 N.W.2d 239 (1960). The Court there held that weather and nighttime conditions would not change an otherwise ordinary crossing into an "extra-hazardous" one, so as to require precautions above the statutory requirements. The train crew did here, however, take some extra precaution in placing a flare at the crossing.
 
 
 19
 The plaintiff claims that the evidence would support the jury's finding of negligence by any of the following theories: 1.) That the train did not stop prior to entering the crossing, as it usually did; 2.) That if the train did stop and then start up again, there was a lack of due care in failing to stop when the engineer saw the truck; 3.) There was a lack of due care in failing to take into consideration that because of the wind, the truck driver might not hear the train's bell and whistle; 4.) There was a lack of due care because the engineer failed to consider that the truck driver might assume that the train would stop before entering the crossing after seeing the truck; 5.) There was a lack of due care in the failure to have the crew wave lanterns at the crossing until the train had crossed it; 6.) Any flares which had been placed at the crossing were placed negligently.
 
 
 20
 We must reject the contention that items 2, 3, and 4 are in any way indicative of negligence on the part of the railroad. Taking plaintiff's proof as to the practice of the train in stopping before proceeding onto the crossing in the strongest light possible, it by no means establishes that the train stopped for traffic at this crossing. The train still had the right of way at the crossing and was under no duty to stop for oncoming traffic. The truck driver had no right to assume, if indeed he did assume, that the train would stop for him upon seeing him. Indeed the driver's duty was the exact opposite — if in fact he saw the train, his duty was to stop for it. Furthermore, as will be discussed more thoroughly, his duty was to keep a proper lookout so that he could see the train and to keep his vehicle under proper control so that he could stop in time if necessary.
 
 
 21
 As to items 5 and 6, we must also reject the contention that they represent negligence on the part of the railroad. The duty to place flares and have warning flagmen at this crossing is not a statutory duty. The failure of the railroad to have these warning devices at the crossing would be negligence only if this crossing were "extra-hazardous". As discussed above, there was no such contention in this case and it seems clear under Minnesota law that this was not an extra-hazardous crossing.
 
 
 22
 Thus the only conceivable act of negligence on the part of the railroad suggested by the evidence in this case is the failure of the train to stop prior to entering the crossing. We will note that there is some question as to whether the evidence on this issue was admissible in this case, but we do not place controlling significance on this aspect of the issue; even conceding the evidence's admissibility and its tendency to prove that the train did not stop, we still do not think it is sufficient to support the verdict of liability on the part of the railroad.
 
 
 23
 There are two questions with regard to the admissibility of this evidence. First of all, the members of the train crew all testified that the train did in fact stop at the crossing. The only testimony that contradicted this evidence was the testimony of Hanson that he did not hear it stop and in his opinion it did not stop. Hanson was in his house at the time of the occurrence and did not observe any of the events. There is also a problem of proof as to whether this evidence is sufficient to establish that the train did not in fact stop at the crossing, but we feel the evidence is admissible in the discretion of the trial court for whatever probative value it might have.
 
 
 24
 Secondly, there is a question as to whether the evidence as to the practice of the railroad to stop its train at this crossing is admissible. The Minnesota courts have consistently held that it is error to permit introduction of evidence of the railroad company's private rules regarding operation of its trains and violation of these rules by its employees. The theory of such a rule is that the railroad's duty of due care is governed by law and not by its private practices, and that the jury would be unduly confused by an inquiry as to whether the railroad was obeying its own rules rather than whether it was meeting its legal duty of due care. Lee v. Molter, 227 Minn. 557, 35 N.W.2d 801, 806 (1949); Gillespie v. Great Northern Ry. Co., 127 Minn. 234, 149 N.W. 302 (1914). However, the plaintiff contends that this rule is not applicable in the instant case because the railroad's practice of stopping at the crossing was initiated at the request of the Railroad and Warehouse Commission. We do not think the request constitutes an order, the violation of which could be considered as negligence per se. Negligence is to be measured by the legal obligation to use due care under the circumstances existing at the time of the accident.
 
 
 25
 It is clear that the deceased was guilty of negligence as a matter of law, and that the negligence was of a serious degree. The decedent was an experienced truck driver, familiar with the crossing in question. His view of the crossing was relatively unobstructed. He had the duty to keep a proper lookout for the train and to have his vehicle under proper control so that he could stop if there was a train approaching the crossing. If the weather conditions that night made the conditions more dangerous, he then had the duty to exercise more caution so as to be able to stop if necessary. Hanson v. Duluth, M. & I. R. Ry. Co., 267 Minn. 24, 124 N.W.2d 486 (1963); Bigo v. Duluth M. & I. R. Ry. Co., 262 Minn. 471, 115 N.W.2d 230 (1962).
 
 
 26
 On the other hand, the railroad's negligence in this case, if any, was of a much less serious character and its status as a proximate cause of the accident is in considerable doubt. Assuming that the train did in fact not stop prior to entering the crossing, it nevertheless was going very slowly, not more than 10 to 12 miles per hour, and was able to stop within 50 feet of the crossing. Even if it had stopped prior to entering the crossing, it would probably have been traveling at least at that rate of speed after starting up again. Furthermore, once it had stopped at the crossing, it had the right of way across the crossing upon starting up again. There is no way to infer from the evidence presented in this case that, again assuming that it did not stop, if it had stopped it would not have reached the crossing at the time it did anyway. Thus the negligence of the defendant in failing to stop its train is not shown to have a causal connection with the accident. In any event, this negligence on the part of the railroad cannot be deemed to be greater than that of the decedent's as the proximate cause of the accident.
 
 
 27
 Thus we conclude that the trial court was in error in failing to direct a verdict for the defendant. The judgment of the District Court is reversed.
 
 
 
 Notes:
 
 
 [1]
 This statute provides in pertinent part:
 "Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not as great as the negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering. The court may, and when requested by either party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of negligence attributable to each party; and the court shall then reduce the amount of such damages in proportion to the amount of negligence attributable to the person recovering."
 
 
 [2]
 The jury found plaintiff's total damages to be $157,600; but judgment was entered for $35,000, the maximum recoverable under M.S.A. § 573.02, subd. 1